IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lance L. Renfrow, et al.,<br><br>Plaintiffs/Counterdefendants,<br><br>v.<br><br>BDP Innovative Chemicals Company,<br><br>Defendant/Counterclaimants. | No. CV-14-01183-PHX-GMS<br><br>**ORDER RE CLAIM CONSTRUCTION** |

Pending before this Court are the Parties' briefs addressing claim construction. (Docs. 72–75.) The Court held a *Markman* Hearing on August 8, 2015, at which the Parties presented additional arguments. The Court construes the meaning of the disputed claim language as a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) *aff'd*, 517 U.S. 370 (1996).

## BACKGROUND

Plaintiffs patentee and inventor Lance L. Renfrow and his exclusive licensee Clear Solutions USA, L.L.C. (jointly "Renfrow") allege that Defendant BDP Innovative Chemicals Company ("BDP") infringes U.S. Patent 6,855,679 ("the '679 patent") (Doc. 1, Ex. A). The '679 patent includes an abstract, which describes the patent as follows:

> A detergent blend is prepared by admixing together a fluorinated surfactant and an amphoteric-based sultaine surfactant hydrotrope. This blend can then be formulated into a detergent concentrate which includes a caustic compound, a chelant, a descaler, and other adjuvants to enable the concentrate to be diluted into a use solution for use in either an acid or base environment. The use solution prepared from

> the detergent blend is particularly useful in cleaning draft beer
> lines, dairy lines, and the like.

(*Id.*)

The '679 patent includes seven "composition" claims patenting detergent blends, concentrates, and use solutions. The '679 patent also includes three "method" claims establishing methods of cleaning fluid delivery lines. The only claims that the Parties dispute in their construction of the '679 patent are the method claims, Claims 8, 9, and 10. (Doc. 71.)

The full text of Claims 8, 9, and 10 from the '679 patent, with disputed phrases underlined, is as follows:

> 8. A method of cleaning a fluid delivery line <u>in a brewery</u> by pumping through the line a use solution comprising:
>    a) a fluorinated surfactant;
>    b) <u>an amphoteric-based sultaine surfactant hydrotrope</u>; and
>    c) water.
>
> 9. The method of claim 8 wherein:
>    pumping is done at a temperature ranging from about 50° F. to about 200° F.
>
> 10. The method of claim 9 which further comprises:
>    rinsing the line at ambient temperatures after pumping the use solution therethrough.

(Doc. 1, Ex. A)

All of the disputed language is in the body of Claim 8. Claims 9 and 10 incorporate this disputed language through reference to each previous claim.

## DISCUSSION

### I. Legal Standard

A patent includes two basic components: (1) a written description of the invention, which is referred to as the "specification" of the patent, and (2) the patent

claims. The claims of a patent define the scope of the invention to which the patentee is entitled. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman*, 52 F.3d at 976. Claim construction is exclusively within the province of the Court. *Id.* at 979.

"[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics*, 90 F.3d at 1582. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Id.* The Court ascribes to the words of a claim "the ordinary and customary meaning . . . that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification . . . and the prosecution history." *Id.* "A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning." *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996).

"[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. "[I]n case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.

In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.

The patent's prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* The prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes," but it is still part of the intrinsic evidence that is the primary source of the claim construction analysis. *Id.*

The Court may, in its discretion, choose to consider extrinsic evidence such as "expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. "[W]hile extrinsic evidence 'can shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). "[A] court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'" *Id.* at 1318 (quoting *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)). "Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." *Markman*, 52 F.3d at 981.

## II. Construction of Disputed Terms in Claim 8 of the '679 Patent

### A. "In a Brewery"

The Parties dispute whether the expression "in a brewery" in Claim 8's preamble is a statement of intended use or a limitation. The Federal Circuit has held that "[g]enerally, the preamble does not limit the claims." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002) (citing *DeGeorge v. Bernier*, 768 F.2d 1318, 1322 n. 3 (Fed. Cir. 1985)). However, the preamble limits a claim to the extent that it "recites essential structure or steps, or . . . is 'necessary to give life, meaning, and vitality'

- 4 -

to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (quoting *Kropa v. Robie*, 187 F.2d 150, 152 (C.C.P.A. 1951))). Conversely, the preamble is not a limitation where it merely "state[s] a purpose or intended use for the invention." *Id.* (quoting *Rowe v. Dror,* 112 F.3d 473, 478 (Fed. Cir. 1997)). "[S]tatements of intended use or asserted benefits in the preamble may, in rare instances, limit apparatus claims, but only if the applicant clearly and unmistakably relied on those uses or benefits to distinguish prior art." *Id.* at 809.

Each phrase in the preamble is analyzed separately to determine if it is a limitation or a statement of intended use. *See TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015) (holding that the construction of one phrase as a limiting phrase in the preamble "does not necessarily convert the entire preamble into a limitation, particularly one that only states the intended use of the invention"). The preamble should be construed as limiting in its entirety only if it "cannot be parsed into limiting and non-limiting portions." *Blue Calypso, Inc. v. Groupon, Inc.*, 2015 WL 4274985, at *12 (E.D. Tex. June 14, 2015).

A location noted in the preamble, such as "in a brewery," generally does not limit the claim because it is obvious that a method used in one location could be used in another. *See* 35 U.S.C. § 103. In *Catalina*, the Federal Circuit held that the phrase "located at predesignated sites such as consumer stores" in a coupon terminal patent's claim preamble was not a limitation. 289 F.3d at 810. The court noted that "the specification, in its entirety, does not make the location of the terminals an additional structure for the claimed terminals," but rather "merely gives an intended use." *Id.* Moreover, during prosecution of the patent at issue in *Catalina*, the original preamble included the location designation, but the examiner nonetheless rejected the original claim as obvious in light of prior art, concluding that "the only difference between the applicants' claimed invention and [another] patent was the location," which was not a meaningful difference for patentability. *Id.* at 806. The applicants amended their

application in various ways "to bolster their assertion of nonobviousness" but left the location language unaltered, and the patent was granted. *Id.* The prosecution history confirmed that "the applicants did not rely on this intended use [the location designation] to distinguish their invention over the prior art." *Id.* at 810.

In the present case, "in a brewery" is a statement of intended use, not a limitation. This phrase provides a location, not a step in the method, and as such does not give "life, meaning, and vitality" to the claim. *See Kropa*, 187 F.2d at 152. The steps involved in this method claim involve pumping the specified use solution through a fluid delivery line. These limiting phrases can easily be parsed from the non-limiting phrase "in a brewery." *See TomTom, Inc. v. Adolph*, 790 F.3d at 1323; *cf. Blue Calypso*, 2015 WL 4274985, at *12. The method is the same whether performed in a milk processing plant, a brewery, or another location.

The specification supports the interpretation that "in a brewery" is a statement of intended use, not a limitation. In the summary section of the claim specification, the inventor notes that the invention "is useful for cleaning protein deposits in brewery apparatus as well as dairy and other related food processing apparatus." (Doc. 1 at Ex. A.) Similarly, in the description of the preferred embodiment, the inventor notes that the claimed "use solution is deployed by pumping it through the fluid delivery lines, such as a draft line, milk line, etc." (*Id.*) The specification then notes that the invention exhibits "superior capabilities in cleaning draft beer delivery lines," but does not specify that these delivery lines must be in a brewery. (*Id.*)

Nothing in the prosecution history suggests that the phrase "in a brewery" was intended to limit the scope of Claim 8. Much like in *Catalina*, the phrase at issue here was included in the original preamble of Claim 8. (Doc. 72 at Ex. 2.) It was not added during prosecution to distinguish prior art, and there is no indication that "the applicant clearly and unmistakably relied on those uses or benefits to distinguish prior art." *See Catalina*, 289 F.3d at 809.

///

BDP speculates that the fact that an alteration in Claim 1 (adding that the fluorinated surfactant must comprise "a 50:50 weight mixture blend of C4 to C14 perfluoro alkyl ethyl phosphonate acid and a perfluoro alkyl ethyl phosphonic acid") was not incorporated into Claim 8 indicates that the phrase "in a brewery" must be meaningful, in that it narrows Claim 8. (Doc. 73 at 12.) This argument is not persuasive. Claim 8 is already narrow in that it is a "method" claim; it involves a process of cleaning fluid delivery lines by pumping a solution through them. There is no reason to assume that the phrase "in a brewery" provided any needed narrowing or affected the prosecution history in any way.[1]

The Court therefore construes the phrase "in a brewery" in Claim 8's preamble as a statement of intended use and not a limitation of the scope of Claim 8.

**B.   "An Amphoteric-Based Sultaine Surfactant Hydrotrope"**

The Court must also construe the phrase "an amphoteric-based sultaine surfactant hydrotrope" in Claim 8(b).

Renfrow requests the following construction of Claim 8(b) (the disputed language is bolded):

> a surface active agent that (i) can function as cationic (i.e. an acid), anionic (i.e. a base, alkaline or caustic), or zwitterionic **(which may have both a positive and negative charge)**, (ii) has at least one anionic group that is sulfonate (i.e. SO3-), and (iii) improves the solubility of **a surfactant**

(Doc. 72 at 11.)

BDP requests a construction of Claim 8(b) that is more limiting:

/ / /

---

[1] BDP also argues that Renfrow stated under oath in the prosecution history of a later filed patent that the composition claims in the '679 patent are narrowed by the amended language in Claim 1, and this proves that Claim 8 must have been narrowed by the phrase "in a brewery." (Doc. 73 at 14-16.) This argument lacks merit for the same reason—Claim 8 is an independent method claim, and statements about the composition claim in Claim 1 do not apply to Claim 8.

> a surface active agent that (i) can function as cationic (i.e. an acid), anionic (i.e. a base, alkaline or caustic) or zwitterionic **(having a positive and negative charge) depending on the pH of the medium,** (ii) has at least one anionic group that is sulfonate (i.e. SO3-), **(iii) is known by the names sultaine, sulfobetaine and hydroxysultaine,** and (iv) improves the solubility of **the fluorinated surfactant**

(Doc. 73 at 17.)

As such, the Court must construe (1) "amphoteric-based," (2) "sultaine," and (3) "hydrotrope."

### 1. "Amphoteric-Based"

At first glance, the parties seem to agree that "amphoteric-based" means that the surface active agent "can function as cationic (i.e. an acid), anionic (i.e. a base, alkaline or caustic), or zwitterionic," and therefore they disagree only on the definition of "zwitterionic" and whether the functioning depends on the pH of the medium. However, the dispute also involves the interpretation of the coordinating conjunction "or," in light of BDP's proposed phrase "depending on the pH of the medium."

Underlying this dispute is the primary issue: whether Claim 8(b) should be construed to cover Mirataine ASC, which is the preferred embodiment of the amphoteric hydrotrope in the '679 patent specification. (Doc. 1 at Ex.).

Mirataine ASC always carries a positive charge. (Doc. 72 at Ex. D to Sabatini Decl.) It usually carries a negative charge as well, but it loses that negative charge under extremely low pH conditions. (*Id.*) Thus, Mirataine ASC almost always has both a positive and negative charge, in rare circumstances it has only a positive charge, and it never has only a negative charge.

A "cation" is a positively charged ion, and therefore the adjective "cationic" means "having a positive charge." Likewise, an "anion" is a negatively charged ion, and therefore the adjective "anionic" means "having a negative charge." A "zwitterion" is an

ion with both a positive and negative charge, and therefore the adjective "zwitterionic"[2] means "having both a positive and negative charge."

BDP relies on a strict definition of "amphoteric" which demands that amphoteric surfactants "must carry a positive charge at low pH and a negative charge at high pH and may form internally neutralized ionic species (zwitterions) at an intermediate pH." (Doc. 73 at 17 (quoting Martin M. Rieger & Linda D. Rhein, Surfactants in Cosmetics 4-5 (2d ed. 1997)).) BDP's proposed construction incorporates this demand by listing the three possible functions (catonic, anionic, zwitterionic) conjoined with the word "or," and adding the phrase "depending on the pH of the medium," which could alter the meaning of the word "or" to suggest that to be "amphoteric" a surfactant must be capable of presenting in all three of the alternative states depending upon the pH of the medium. Because Mirataine ASC never becomes anionic under any circumstances, it is not amphoteric according to this definition.

The '679 patent specification designates Mirataine ASC as the preferred embodiment of the amphoteric hydrotrope. (Doc. 1 at Ex.). Although not the only factor to be considered, the Federal Circuit has indicated that the preferred embodiment should be given great weight in construing a patent's claims. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("Indeed, if 'solder reflow temperature' were defined to mean liquidus temperature, a preferred (and indeed only) embodiment in the specification would not fall within the scope of the patent claim. Such an interpretation is rarely, if ever, correct and would require highly persuasive evidentiary

---

[2] Renfrow argues that "[o]ne of ordinary skill in the art would understand that while Mirataine ASC is often referred to as amphoteric (as did the inventor in the '679 patent), it more accurately may be described as a 'zwitterionic.'" (Doc. 72 at 18.) Once Renfrow uses "zwitterionic" as a noun, he argues that "a zwitterionic" (noun) need not always *be* zwitterionic (adjective). Mirataine ASC is usually zwitterionic but it becomes cationic under extremely low pH conditions, so Renfrow argues against "imposing a requirement that the zwitterionic have a positive and negative charge at all times." (*Id.* at 19.) The Court notes that it need not determine the meaning of "zwitterionic" in its noun form to construe "amphoteric-based," the language at issue in Claim 8(b).

support, which is wholly absent in this case.").

Here, ample evidence suggests that a person of ordinary skill in the art, reading Claim 8 "in the context of the entire patent, including the specification," *Phillips*, 415 F.3d at 1313, would interpret "amphoteric" in such a way that includes Mirataine ASC. Mary Ronan of Solvay, the current manufacturer of Mirataine ASC, confirmed that Mirataine ASC is sometimes referred to as an amphoteric surfactant, even though it is not, strictly speaking, amphoteric. (Doc. 72 at Ex. D to Sabatini Decl.) Moreover, chemists from Rhodia, which at one time owned the patent for Mirataine ASC and manufactured it, authored an article entitled "The Value of Sultaines," subcaptioned "Regina Cosby and Frank Wagner of Rhodia take a new look at amphoteric surfactants." (Doc. 75-3 at 3.) The article compares and contrasts two types of amphoterics: sultaines and betaines. At one point the authors note that neither sultaines nor betaines can ever become anionic at any pH and are therefore "not truly amphoteric" but that both "are commonly referred to as such." (*Id.*) In short, using the strictest definition of "amphoteric," there is *no such thing* as an "amphoteric-based sultaine surfactant hydrotrope," because a sultaine is never truly amphoteric. A person of ordinary skill in the art would understand that the word "amphoteric" should be defined more inclusively in the context of the patent.

Nonetheless, a construction of "amphoteric" as functioning as "cationic, anionic, or zwitterionic" is too broad. The word "amphoteric" derives from the Greek word meaning "both," and the Court has seen no evidence suggesting that a person of ordinary skill in the art would deem a surface active agent which is *always only positive* or *always only negative* to be amphoteric. As such, an agent that is only cationic or only anionic is not amphoteric.

The Court therefore construes "amphoteric-based" as "can function sometimes or always as zwitterionic (having both a positive and negative charge), and/or can function as cationic (i.e. an acid) under certain conditions and as anionic (i.e. a base, alkaline, or caustic) under other conditions."

### 2. **"Sultaine"**

BDP next seeks to include a clause in Claim 8(b) that lists synonyms for the term "sultaine": "(iii) is known by the names sultaine, sulfobetaine and hydroxysultaine." BDP's proffered reason for including these synonyms is that they will assist the jury in understanding the complicated language of the claim. Whether the language in a claim construction will assist a jury's comprehension is a proper consideration. *See Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000). However, BDP points to no portion of the '679 patent's specification that includes the terms sulfobetaine and hydroxysultaine. Adding synonyms that are unfamiliar to the jury will not assist the jury in understanding the definition of the term "sultaine" and may serve only to confuse the jury. This portion of BDP's proposed definition is rejected.

### 3. **"Hydrotrope"**

Renfrow's proposed construction of the word "hydrotrope" in Claim 8(b) asserts that a hydrotrope "improves the solubility of a surfactant." (Doc. 72 at 11.) BDP's proposed construction asserts that a hydrotrope "improves the solubility of the fluorinated surfactant," referring back to the component of the use solution articulated in Claim 8(a).

Although Claim 8(a) includes the term "fluorinated surfactant," Claim 8(b) does not. Thus, the Court sees no reason to construe "surfactant" for purposes of Claim 8(b) as "the fluorinated surfactant." The hydrotrope may improve the solubility of the fluorinated surfactant, but the language of Claim 8(b) does not indicate that it must do so.

BDP argues in favor of the limitation by quoting two passages from the specification: one in the "Background of the Invention" section, stating that "a single surfactant is ultimately hydrotroped into the use solution," and one in the "Summary of the Invention" section, stating that "the surfactant used in the blend[] is a fluorinated surfactant." (Doc. 73 at 21 (quoting Doc. 1 at Ex. 1.)) This language suggests that the fluorinated surfactant must be "hydrotroped" (made more soluble), and common sense indicates that the amphoteric-based sultaine surfactant hydrotrope must be doing the hydrotroping.

Nonetheless, this limitation from the specification cannot be imported into the construction of Claim 8(b). It is well-settled law that "claims must be read in view of the specification, but limitations from the specification are not to be read into the claims." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002) (internal citation omitted); *see also Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008) ("As with any other type of claim, courts must carefully avoid importing limitations from the specification into method claims."); *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed.Cir.2005) ("In examining the specification for proper context, however, this court will not at any time import limitations from the specification into the claims."). The broader construction ("a surfactant") in no way rules out the possibility that the fluorinated surfactant is indeed being hydrotroped, but it does avoid improperly reading a limitation from the specification into the claim.

The Court therefore construes "hydrotrope" as an agent that "improves the solubility of a surfactant."

## CONCLUSION

The Court construes the disputed claims as follows:

The term "in a brewery" in the preamble of Claim 8 is a statement of intended use and not a limitation on Claims 8, 9, and 10.

The term "an amphoteric-based sultaine surfactant hydrotrope" in Claim 8(b) is construed as "a surface active agent that (i) can function sometimes or always as zwitterionic (having both a positive and negative charge), and/or can function as cationic (i.e. an acid) under certain conditions and as anionic (i.e. a base, alkaline, or caustic) under other conditions, (ii) has at least one anionic group that is sulfonate (i.e. SO3-), and (iii) improves the solubility of a surfactant."

For the foregoing reasons,

/ / /

/ / /

/ / /

**IT IS HEREBY ORDERED** that the claims are construed as above.

Dated this 1st day of September, 2015.

_____
Honorable G. Murray Snow
United States District Judge